# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 11, 2005          Decided June 28, 2005

No. 04-5199

RENE' SCHNEIDER, ET AL.,
APPELLANTS

v.

HENRY ALFRED KISSINGER AND
UNITED STATES OF AMERICA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01902)

———

*Laura Rotolo*, student counsel, argued the cause appellants. With her on the briefs were *Michael E. Tigar*, and *Alison Stites*, *Christine Parsadaian*, *Courtney J. Nogar*, *Debra L. Spinelli-Hays*, *James B. Cowden*, *Karen Corrie*, *Melissa Mandor*, *Timothy L. Foden*, *Jennifer Dodenhoff*, and *Aaron Lloyd*, student counsel.

*Robert M. Loeb*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Daniel Meron*, Acting Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, and *Barbara L. Herwig*, Assistant Director.

Before: SENTELLE, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: René and Raúl Schneider, surviving sons of deceased Chilean General René Schneider, together with José Pertierra, personal representative of the estate of General Schneider, brought this action in United States District Court for the District of Columbia against the United States and Henry Kissinger, who at the time of the relevant events was the National Security Advisor to the President of the United States. The complaint alleged in nine counts, all of them directed against both defendants, that Kissinger and the United States had caused, in conjunction with Chilean persons not named as defendants, the kidnapping, torture, and death of Plaintiffs-Appellants' decedent. The District Court granted the motion of Defendants-Appellees to dismiss Appellants' complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for lack of jurisdiction and failure to state a claim upon which relief could be granted. Plaintiffs filed this appeal. Because we agree with the District Court that the courts lack jurisdiction over nonjusticiable questions raised by the complaint, we affirm the grant of dismissal pursuant to Rule 12(b)(1).

## I. Background

Appellants filed their original complaint on September 10, 2001, identifying their relationship to the deceased general and claiming against Kissinger, the United States, and Richard Helms (former Director of the CIA). That complaint alleged that in 1970 the leader of the Chilean leftist coalition, Dr. Salvador Allende, won a slight plurality of the vote (36.3%) in Chile's presidential election, and that this victory on his part

created the expectation that he would, in the following months, be ratified by the Chilean congress as the first socialist president of the country. According to the complaint, "[k]ey United States policymakers" opposed the choice of Allende as president of Chile and on September 8, 1970, "policymakers" began the process of assessing "the pros and cons and problems and prospects involved should a Chilean military coup be organized . . . with U.S. assistance." Compl. ¶ 16, Appellees' Appendix (App.) at 7. After receiving further information, on September 15, 1970, defendants Kissinger, Helms, and Attorney General John Mitchell met with President Nixon. The President ordered that steps be taken to prevent Allende from becoming president, and specifically, that the CIA was to "play a direct role in organizing a military coup d'etat in Chile" and do quickly whatever was possible to prevent the seating of a possible socialist president. Compl. ¶ 18, App. at 8. The President expressed that he was "not concerned" about any risks involved, authorized $10 million in funds to effect such a coup, and required a plan of action be drafted within 48 hours. *Id.*

The complaint further alleged that efforts to prevent Allende from achieving the presidency proceeded on two tracks. "Track I" was a covert political, economic, and propaganda campaign approved by a subcabinet level body of the executive established to exercise political control over covert operations abroad. Compl. ¶ 19, App. at 8. "Track II" activities were undertaken in direct response to the President's September 15 order and were directed "towards actively promoting and encouraging the Chilean military to move against Allende." *Id.* In the following months, the tracks moved together. The United States Ambassador to Chile was authorized to encourage a military coup and to intensify contacts with Chilean military officers in order to ascertain their willingness to support such a coup. The Ambassador was also authorized to make contacts in the Chilean military aware that the military would receive no

military assistance from the United States if Allende became president of Chile. The Ambassador reported back that General Schneider would be an impediment to achieving the goals outlined in the President's directive, and that he would have to be neutralized. The complaint went on to allege particular acts undertaken in furtherance of the goal of establishing a military coup and claims for relief based on those actions, including the kidnapping, torture, and killing of General Schneider. In all, the complaint alleged seven claims: (1) summary execution; (2) torture; (3) cruel, inhumane, or degrading treatment; (4) arbitrary detention; (5) wrongful death; (6) assault and battery; and (7) intentional infliction of emotional distress.

Defendants moved to dismiss the complaint on November 9, 2001; Plaintiffs responded on December 17, and Defendants replied on January 31, 2002. Also, in November, the Attorney General submitted a certification that Kissinger and Helms were acting within the scope of federal employment at the time of the incident out of which plaintiffs' claims arose. Based on that certification, the Attorney General asked the court to remove the individual defendants from the case under the *Westfall* Act, 28 U.S.C. § 2679, and substitute the United States. In response to the *Westfall* certification (and to Helms's October 2002 death), plaintiffs submitted an amended complaint on November 11, 2002. The amended complaint omitted the direct references to President Nixon, deleted the deceased Helms as a defendant, and added two new claims under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), one for "negligent failure to prevent summary execution, arbitrary detention, cruel, inhumane, or degrading treatment, torture, wrongful death, and assault and battery," and one for intentional infliction of emotional distress. Am. Compl. ¶¶ 87-100, App. at 22-24. Defendants renewed their motion to dismiss on December 12, 2002. Plaintiffs responded to the motion on January 17, 2003. On March 30, 2004, the court granted the motion to dismiss pursuant to Rule

12(b)(1) on the basis that the Political Question Doctrine rendered plaintiffs' claims nonjusticiable. *Schneider v. Kissinger*, 310 F. Supp. 2d. 251, 257-64 (D.D.C. 2004) (applying *Baker v. Carr*, 369 U.S. 186, 210 (1962)). In the alternative, the court held that the complaint failed under Rule 12(b)(6) because (1) Kissinger was immune under the *Westfall* Act, *Schneider*, 310 F. Supp. 2d. at 264-67, and (2) the United States was immune as sovereign, *id.* at 268-70. The court noted early in its decision that it would rely on *both* the original and amended complaints in making its decision, because "[t]he parties ask the Court to consider all briefs, as they did not repeat their initial arguments in response to the amended complaint." *Id*. at 254 nn. 2-3.

Because we determine that the court correctly ruled that it lacked jurisdiction as a result of the application of the political question doctrine, we need not reach the alternate ground. We note in passing that some of the discussion of sovereign immunity and *Westfall* questions bears on our application of the Political Question Doctrine, but we need make no determination of the questions raised by those theories in light of the jurisdictional question that is determinative.

## II. The Political Question Doctrine

The principle that the courts lack jurisdiction over political decisions that are by their nature "committed to the political branches to the exclusion of the judiciary" is as old as the fundamental principle of judicial review. *Antolok v. United States*, 873 F.2d 369, 379 (D.C. Cir. 1989) (separate opinion of Sentelle, J.). In the venerable case of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), Chief Justice Marshall first expressed the recognition by the judiciary of the existence of a class of cases constituting "political act[s], belonging to the executive department alone, for the performance of which entire

confidence is placed by our Constitution in the supreme executive; and for any misconduct respecting which, the injured individual has no remedy." *Id.* at 164. In a continuing line beginning with Chief Justice Marshall's analysis in *Marbury v. Madison*, this doctrine has evolved as a limitation of the jurisdiction of the courts particularly applicable to foreign relations. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302-03 (1918). Chief Justice Marshall, writing again in *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818), described questions of foreign policy as "belong[ing] more properly to those . . . who can place the nation in such a position with respect to foreign powers as to their own judgment shall appear wise; *to whom are entrusted all its foreign relations*; then to that tribunal whose power as well as duty is confined to the application of the rule which the legislature may prescribe for it." *Id.* at 634 (emphasis added).

Contemporary application of the Political Question Doctrine, as recognized by the District Court, draws on the analysis set forth in *Baker v. Carr*, 369 U.S. 186 (1962). The *Baker* Court first recognized that "the political question doctrine is 'primarily a function of the separation of powers.'" *Schneider v. Kissinger*, 310 F. Supp. 2d at 258 (quoting *Baker*, 369 U.S. at 210). In *Baker*, the Supreme Court enumerated six factors that may render a case nonjusticiable under the Political Question Doctrine:

> Prominent on the surface of any case held to involve a political question is found a [1] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent

resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. The *Baker* analysis lists the six factors in the disjunctive, not the conjunctive. To find a political question, we need only conclude that one factor is present, not all. Nonetheless, we note that most of the factors counsel against the exercise of jurisdiction over the controversy that Plaintiff-Appellants bring to the court.

1. *Textually demonstrable constitutional commitment to other branches*

First, the lawsuit raises policy questions that are textually committed to a coordinate branch of government. As the Supreme Court suggested in *Marbury* and made clear in later cases, "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen*, 246 U.S. at 302. Otherwise put, "foreign policy decisions are the subject of just such a textual commitment," as contemplated in *Baker v. Carr*. *Comm. of the United States Citizens v. Reagan*, 859 F.2d 929, 933-34 (D.C. Cir. 1988).

Absent precedent, there could still be no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government. Article I, Section 8 of the Constitution provides an enumeration of powers of the legislature. That article is richly

laden with delegation of foreign policy and national security powers. Direct allocation of such power is found in Section 8, Clause 1, "the Congress shall have the Power To . . . provide for the Common Defence . . .; Clause 3, "To regulate commerce with foreign nations"; Clause 10, "To define and punish Piracies and Felonies committed on the High Seas and Offenses against the Law of Nations"; Clause 11, "To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water"; Clause 12, "To raise and support Armies . . ."; Clause 13, "To provide and maintain a Navy"; Clause 14, "to make Rules for the Government and Regulation of the land and naval Forces"; Clause 15, "To provide for calling forth the Militia to . . . repel Invasions"; Clause 16, "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States."

In addition to these direct allocations to the Congress of these foreign relations and national security powers, other sections and clauses of Article I bear on the subject to provide further weight to the conclusion of contextual allocation. For example, Section 9 of Article I provides for the suspension of the writ of habeas corpus "when in cases of . . . invasion the public safety may require it." Section 10 allocates to the Congress the authority to provide consent to individual states, without which they may not "enter into any Agreement or Compact with . . . a foreign Power, or engage in War . . . ." This is not to mention the perhaps less direct but undeniably real connection between national security and other powers of Congress, such as that under Article I, Section 8, Clause 1, to "lay and collect Taxes," and Clause 2, to "borrow money on the credit of the United States."

Just as Article I of the Constitution evinces a clear textual allocation to the legislative branch, Article II likewise provides

allocation of foreign relations and national security powers to the President, the unitary chief executive. Article II, Section 2 provides, *inter alia*, that "the President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States . . . ." That same section further provides that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, . . . [and to] appoint Ambassadors, other public Ministers and Consuls." Section 3 of Article II provides that "he shall receive Ambassadors and other public Ministers . . . and shall Commission all the Officers of the United States," including obviously the officers of the military.

While the language of textual commitment of the President is not as extensive as that relating to the legislative branch, nonetheless it is plain that that commitment is real. Indeed, the Supreme Court has described the President as possessing "plenary and exclusive power" in the international arena and "as the sole organ of the federal government in the field of international relations . . . ." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

By contrast, in Article III defining the judicial power of the United States the closest there is to a reference to foreign relations is the extension of jurisdiction to "Cases affecting Ambassadors, other public Ministers and Consuls." U.S. CONST., Art. III, § 1. Obviously all this provides is jurisdiction for adjudication of cases against those officers. It provides no authority for policymaking in the realm of foreign relations or provision of national security. It cannot then be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches.

Neither can it be gainsaid that the subject matter of the instant case involves the foreign policy decisions of the United States. In 1970, at the height of the Cold War, officials of the executive branch, performing their delegated functions concerning national security and foreign relations, determined that it was in the best interest of the United States to take such steps as they deemed necessary to prevent the establishment of a government in a Western Hemisphere nation that in the view of those officials could lead to the establishment or spread of communism as a governing force in the Americas. This decision may have been unwise, or it may have been wise. The political branches may have since rejected the approach, or not. In any event, that decision was classically within the province of the political branches, not the courts. As the Supreme Court has repeatedly reminded us, "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). This is so because "[t]he Judiciary is particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'" *Id.* (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C. Cir. 1981)).

### 2. *No judicially discoverable and manageable standards*

The second criterion of the *Baker* six brings under the nonjusticiable umbrella of political question any case as to which there is "a lack of judicially discoverable and manageable standards for resolving it." 369 U.S. at 217. This factor, even taken apart from the first factor, supports the District Court's conclusion that this case must be dismissed under Rule 12(b)(1). As the District Court well understood, for a court to adjudicate

this case would be for that court to undertake the determination of whether, 35 years ago, at the height of the Cold War between the United States and the western powers on the one hand and the expanding communist empire on the other, "it was proper for an Executive Branch official . . . to support covert actions against" a committed Marxist who was set to take power in a Latin American country. *Schneider*, 310 F. Supp. 2d at 261-62. Unlike the executive, the judiciary has no covert agents, no intelligence sources, and no policy advisors. The courts are therefore ill-suited to displace the political branches in such decision-making.

As we have said before of other security considerations in another context, "it is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role." *Center for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003).

Appellants claim that the District Court erred in holding that no standards exist for determining whether "it was proper for an Executive Branch official . . . to support covert actions against an undesirable figure who was set to take power in a foreign nation." *Schneider*, 310 F. Supp. 2d at 261-62. They assert that the District Court "misconstrued Plaintiffs' claims by framing the issue as an attack on policy." Appellants' Br. at 14. However, it is not at all clear to us why Appellants believe their suit to be anything other than such an attack. They claim that "the D.C. Circuit has held that courts should not invoke the political question doctrine to avoid adjudication of a violation of basic rights." *Id.* However, the only case from this court which they offer for that proposition is *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984). In fact, that case stands for nothing at all, as it was vacated by the Supreme Court

in *Weinberger v. Ramirez de Arellano*, 471 U.S. 1113 (1985). After the remand, this Court reversed and sent the case back to the District Court for dismissal, with no reinstatement of the original opinion ever occurring. *See Ramirez de Arellano v. Weinberger*, 788 F.2d 762 (D.C. Cir. 1986).

In the District Court, though not expressly before us, Appellants had urged that "'the standards for evaluating wrongful death are well established' . . . and that the 'Court need not depart from these in managing the instant action.'" *Schneider*, 310 F. Supp. 2d at 261. We agree with the District Court that this formulation of the issues is no help. As the District Court stated, "[r]esolving the present lawsuit would compel the court, at a minimum, to determine whether actions or omissions by an Executive Branch officer in the area of foreign relations and national security were 'wrongful' under tort law." *Id.* at 262. We agree with the District Court and the Eleventh Circuit in *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997), that recasting foreign policy and national security questions in tort terms does not provide standards for making or reviewing foreign policy judgments. In *Aktepe*, the Eleventh Circuit considered a case brought by Turkish sailors alleging injuries and wrongful death suffered as a result of missiles fired by a United States Navy vessel during North Atlantic Treaty Organization training exercises. In holding that the action was barred, *inter alia*, by the second *Baker* political question factor, that Circuit noted that "in order to determine whether the Navy conducted the missile-firing drill in a negligent manner, a court would have to determine how a reasonable military force would have conducted the drill." *Id.* The *Aktepe* court went on to observe "[a]s the Supreme Court noted in a related context, 'it is difficult to conceive of an area of governmental activity in which the courts have less competence.'" *Id.* (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). Similarly here, in order to determine whether the

covert operations which allegedly led to the tragic death of General Schneider were wrongful, the court would have to define the standard for the government's use of covert operations in conjunction with political turmoil in another country. There are no justiciably discoverable and manageable standards for the resolution of such a claim.

3. *Judicial resolution would require an initial policy determination of a kind clearly for nonjudicial discretion*

Without rehashing the constitutional separation of powers concerns raised by the two *Baker* factors already discussed, we note that the same sort of problems raise the third factor as well. The District Court well stated the matter:

> [P]laintiffs contend that "the Court is not here asked to pass judgment on any perceived value or danger of the Allende government to United States interests and need not make any policy determination[.]" Pls.' Opp. I at 15. While the plaintiffs are correct that the Court might be able to avoid evaluating the merits of a potential Allende Government in 1970, it would nonetheless be forced to pass judgment on the means used by the United States to keep that government from taking power.

*Schneider*, 310 F. Supp. 2d at 263. While we are not at all convinced that we would be able to avoid evaluating the merits of the potential Allende government in 1970, we are completely in agreement with the District Court that we would be forced to pass judgment on the policy-based decision of the executive to use covert action to prevent that government from taking power. Allying United States intelligence operatives with dissidents in another country to kidnap a national of that country may be a drastic measure. To determine whether drastic measures should be taken in matters of foreign policy and national security is not

the stuff of adjudication, but of policymaking.  As the Supreme Court has emphasized, "the 'nuances' of 'the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court.'"  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000) (quoting *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983)).

Thus, we agree with the District Court that the third *Baker* factor also counsels against jurisdiction over this case.

4.  *The court could not proceed without expressing a lack of respect to coordinate branches of government*

From what we have concluded as to the first three *Baker* factors, it seems apparent to us that we could not determine Appellants' claims without passing judgment on the decision of the executive branch to participate in the alleged covert operations–participation in which, we note from the record, has already been the subject of congressional investigation.  We therefore affirm the conclusion of the District Court that "[a] court should refrain from entertaining a suit if it would be unable to do so without expressing a lack of respect due to its coequal Branches of Government."  310 F. Supp. 2d at 264 (citing *Baker v. Carr*, 369 U.S. at 217) (other citations omitted).

5.  *Summary*

For the reasons set forth above, we conclude that at least the first four of the six *Baker* factors compel a determination that this case raises political questions committed to the political branches and therefore is beyond the jurisdiction of the courts.  Appellants counter the government's political question arguments by asserting that this case does not fall within the Political Question Doctrine because "there is a difference

between policy and the implementation of policy, and . . . the latter is within the realm of the judiciary to oversee." Appellants' Br. at 12. For this proposition, they cite *DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236 (D.C. Cir. 1987), which stated, "whereas attacks on foreign policymaking are nonjusticiable, claims alleging non-compliance with the law are justiciable, even though the limited review that the court undertakes may have an effect on foreign affairs." 810 F.2d at 1238.

Appellants are indeed correct that the *DKT Memorial* opinion so stated. However, it did so on a record immediately distinguishable from the controversy raised by the present litigation. *DKT Memorial* concerned not the executive's making of a policy decision and implementing that decision, but rather a challenge to the constitutionality of the manner in which an agency sought to implement an earlier policy pronouncement by the President. Indeed, after the jurisdictional decision in *DKT Memorial* had ordered the matter remanded to the District Court, the District Court's decision on remand came before this Court in a second appeal. We then made plain the narrowness of our original jurisdictional holding:

> In the present case, where the President acted under a congressional grant of discretion as broadly worded as any we are likely to see, and where the exercise of that discretion occurs in the area of foreign affairs, we cannot disturb his decision simply because some might find it unwise or because it differs from the policies pursued by previous administrations.

*DKT Memorial Fund Ltd. v. Agency for Int'l Development*, 887 F.2d 275, 281-82 (D.C. Cir. 1989). Thus, our ultimate disposition of the *DKT Memorial* question supports rather than undermines the District Court's holding that the present case

falls within the realm of nonjusticiable political questions first recognized in *Marbury v. Madison* and delineated in *Baker v. Carr*.

### III. Other Issues

Appellants halfheartedly make an ill-formed argument that the actions of Defendant Kissinger in the Schneider/Allende matter were *ultra vires*. Apparently it is their contention that, as such, the entire Schneider/Allende matter therefore falls outside the Political Question Doctrine. They offer us a single sentence on the subject in their principal brief: "Plaintiffs maintain that Defendant Kissinger's actions were *ultra vires*." Appellants' Br. at 12. This maintenance by plaintiffs is accompanied by a footnote citing *Linder v. Portocarrero*, 963 F.2d 332, 336 (11th Cir. 1992), for the proposition that "'[t]he [sic] complaint challenges neither the legitimacy of the United States foreign policy toward the contras, nor does it require the court to pronounce who was right and who was wrong in the Nicaraguan civil war,' but instead is 'narrowly focused on the lawfulness of the defendants' conduct in a single incident.'" The footnote also includes two other cases, *Lamont v. Woods*, 948 F.2d 825, 833 (2d Cir. 1991), and *Population Inst. v. McPherson*, 797 F.2d 1062, 1068-70 (D.C. Cir. 1986), each of which, like our decision in *DKT Memorial*, *supra*, supports the proposition that foreign policy decisions are outside the jurisdiction of the courts by reason of the political question doctrine, but nonetheless permits adjudication of administrative matters arising out of the implementation of foreign policy. Not only do none of these cases support the proposition that we can adjudicate an entire line of foreign policy decisions, such as Appellants seek to bring to court in the present case, but Appellants have not further developed this argument for our adjudication.

In the District Court, as we noted above, Appellants' amended complaint struck the language of the original complaint alleging very specifically the personal involvement of the President of the United States. Apparently they now are attempting to argue that the acts of a foreign policy advisor are not foreign policy and therefore do not come within the Political Question Doctrine. In an apparent attempt to further this strange maneuver, the amended complaint does include the words "*ultra vires*" in its second paragraph to the following effect:

> The documents show that the knowing practical assistance and encouragement provided by the United States and the official and *ultra vires* acts of Henry Kissinger resulted in General Schneider's summary execution, torture, cruel, inhuman and degrading treatment, arbitrary detention, assault and battery, negligence, intentional infliction of emotional stress, and wrongful death.

Am. Compl. ¶ 2, App. at 161. The *ultra vires* language raises its head again in the eighth claim for relief, which states that:

> Plaintiffs argue in the alternative and without waiving their *ultra vires* arguments, that at the time of the wrongful acts, Defendant Kissinger and other United States agents were employees of federal agencies, including the National Security Council and Central Intelligence Agency, and were acting within the scope of their office or employment.

Am. Compl. ¶ 90, App. at 181-82.

We understand the need of litigants at times to plead in the alternative and even to plead inconsistently in the alternative. Nonetheless, the language purporting not to waive *ultra vires* "arguments" does not help a complaint that never alleges a single claim for relief in *ultra vires* terms. Each of the claims

for relief alleges acts by the Defendants which in the amended complaint consist only of the National Security Advisor and the United States. Their joint actions together can hardly be called anything other than foreign policy. It may be that Plaintiffs intended to allege some other cause of action which might have fallen outside the Political Question Doctrine, but this does not change the questions before us into others than we have discussed above.[1]

We caution that the lack of judicial authority to oversee the conduct of the executive branch in political matters does not leave the executive power unbounded. Granted, it is true, as Chief Justice Marshall recognized in *Marbury*, that "the injured individual has no remedy." *Marbury*, 5 U.S. (1 Cranch) at 164. Nonetheless, the nation has recompense, and the checks and balances of the Constitution have not failed. The political branches effectively exercise such checks and balances on each other in the area of political questions.

If the executive in fact has exceeded his appropriate role in the constitutional scheme, Congress enjoys a broad range of authorities with which to exercise restraint and balance. We catalogued above those authorities specifically related to international relations and national security, but as we also noted

---

[1] It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As we recently said in a closely analogous context: Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.

*United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks omitted).

there, Congress wields the general power to lay and collect taxes and to borrow money on the credit of the United States. Without an appropriation from Congress to fund an undertaking, the President cannot conduct any such undertaking. *See Lichter v. United States*, 334 U.S. 742, 756 ("The constitutional power of Congress to support the armed forces with equipment and supplies is . . . clear and sweeping."). Indeed, Congress has used its appropriations power to draw limits upon the executive's activity in the area of foreign affairs. For example, in the *Boland* Amendment to the Department of Defense Appropriations Act, 1983, Pub. L. No. 97-377, § 793, 96 Stat. 1865 (1982), Congress proscribed the CIA from funding or participating in efforts to overthrow the Nicaraguan government. The *Boland* Amendment example is particularly striking in that elements of the executive branch apparently violated these congressional restraints. Thereafter, Congress exercised one of its other powerful tools against executive overreaching: congressional oversight. The alleged breach of the *Boland* Amendment gave rise to the Iran/Contra proceedings, which in time gave rise to investigations by an Independent Counsel acting under authority conferred by Congress in the Ethics in Government Act of 1978, as amended, 28 U.S.C. § 591 *et seq.* (1988).

In the extreme case, Congress can repair to its authority under Article I, Section 3 of the Constitution to bring impeachment proceedings against an overreaching President. In fact, with reference to the very administration at issue in this case, Congress did just that.

In short, the allocation of political questions to the political branches is not inconsistent with our constitutional tradition of limited government and balance of powers. It is precisely consistent, for it embodies limits and balances between the political branches without the intrusion of the courts into areas

beyond our proper authority and expertise.

## IV.  Conclusion

For the reasons set forth above, we affirm the judgment of the District Court dismissing this action for want of jurisdiction pursuant to Rule 12(b)(1).

*So ordered.*