# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 13, 2016         Decided June 30, 2017

No. 16-5093

AHMED SALEM BIN ALI JABER, PERSONAL REPRESENTATIVE OF THE ESTATE OF SALEM BIN ALI JABER, BY HIS NEXT FRIEND FAISAL BIN ALI JABER AND ESAM ABDULLAH ABDULMAHMOUD BIN ALI JABER, PERSONAL REPRESENTATIVE OF THE ESTATE OF WALEED BIN ALI JABER, BY HIS NEXT FRIEND FAISAL BIN ALI JABER,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00840)

———

*Jeffrey D. Robinson*, pro hac vice, argued the cause for Appellants. With him on the briefs were *Eric L. Lewis*, *Tara J. Plochocki*, and *Brent Nelson Rushforth*.

*Kathleen McClellan* and *Jesselyn Radack* were on the brief for *amici curiae* Brandon Bryant, Lisa Ling, and Cian Westmoreland in support of Appellants.

*Katherine Twomey Allen*, Attorney, U.S. Department of Justice, argued the cause for Appellee. With her on the briefs were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Douglas N. Letter* and *H. Thomas Byron*, *III*, Attorneys.

*Steven D. Schwinn* was on the brief for *amicus curiae* The John Marshall Law School International Human Rights Clinic in support of Appellants.

*Mary E. O'Connell* was on the brief for *amici* professors *Mary Ellen O'Connell* and *Douglas Cassel* in support of Appellants.

Before: BROWN, SRINIVASAN and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Following the terrorist attacks of September 11, 2001, Congress authorized the President "to use all necessary and appropriate force" against al-Qaeda, the Taliban, and associated forces. *See* Authorization for Use of Military Force, Pub. L. No. 107-40 § 2(a), 115 Stat. 224 (2001). Since then, the Executive has increasingly relied upon unmanned aerial vehicles, or "drones," to target and kill enemies in the War on Terror. This case concerns an alleged drone misfire—a bombing that resulted in unnecessary loss of civilian life.

Plaintiffs Ahmed Salem bin Ali Jaber ("Ahmed") and Esam Abdullah Abdulmahmoud bin Ali Jaber ("Esam"), through their next friend Faisal bin Ali Jaber ("Faisal"), seek

a declaratory judgment stating their family members were killed in the course of a U.S. drone attack in violation of international law governing the use of force, the Torture Victim Protection Act ("TVPA"), and the Alien Tort Statute ("ATS"). The district court dismissed their claims primarily on political question grounds, and Plaintiffs appeal. At this stage of proceedings, we must accept all factual allegations asserted in the Complaint as true. *See, e.g.*, *Tri–State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 572 n.1 (D.C. Cir. 2003).

## I.

In late-August 2012, the bin Ali Jaber family gathered in Khashamir, Yemen for a week-long wedding celebration. On August 24th, Ahmed Salem bin Ali Jaber ("Salem"), an imam in the port town of Mukalla, was asked to give a guest sermon at a local Khashamir mosque. His sermon, a direct "challenge[ to] al Qaeda to justify its attacks on civilians," JA 19, apparently did not go overlooked by local extremists. On August 29th, three young men arrived at Salem's father's house and asked to speak with Salem.

The men first arrived in the "early afternoon," but Salem's father told them Salem was "visiting neighboring villages." JA 20. The three men left and returned around 5:00pm that same day, when Salem's father informed them they might find Salem "at the mosque after evening prayers." JA 21. The men again departed before reappearing at the mosque around 8:30pm. Fearful of the men, Salem asked Waleed bin Ali Jaber ("Waleed"), one of the town's two policemen, to accompany him to meet them. According to the Complaint, "Two of the men sat down with Salem under a palm tree near their parked car, while the third [man]

remained a short distance away, watching the meeting." JA 21.

Shortly thereafter, members of the bin Ali Jaber family "heard the buzzing of the drone, and then heard and saw the orange and yellow flash of a tremendous explosion." *Ibid*. According to witnesses, "the first two strikes directly hit Salem, Waleed[,] and two of the three strangers. The third missile seemed to have been aimed at where the third visitor was located . . . . The fourth strike hit the [men's] car." JA 21–22. Plaintiffs now contend a U.S.-operated drone deployed the four Hellfire missiles that killed the five men.

Plaintiffs allege the three visiting men—and not Salem or Waleed—were the intended targets of the attack, and those men were not "high-level, high-value targets to the United States." JA 10. The Complaint further states the men had driven "for a significant distance outside populated areas in order to reach Khashamir," and "loitered alone for a significant period before meeting with Salem and Waleed." *Ibid*. Plaintiffs, therefore, conclude,

> The three young men seeking Salem could have been interdicted earlier in the day at manned checkpoints close to the village along both roads in and out of Khashamir. If [a] more robust detaining force was called for, an allied [*i.e.*, Yemeni] military base was only 2.5–3 kilometers away from where the missiles hit.

JA 39 (second alteration in original).

That evening, a "Yemeni official" spoke by telephone with several members of the bin Ali Jaber family, including Faisal, to "convey[] personal condolences for the wrongful deaths of Salem and Waleed, but [he] offered no official

acknowledgement of or redress for the strike." JA 11. In response to Faisal's repeated attempts to lobby officials first in Yemen and later in the U.S., the "Yemeni government ordered the families receive the equivalent of around $55,000 US in Yemeni currency," which it described as a "condolence" payment. JA 30–31. Later, a member of Yemen's National Security Bureau offered a family member $100,000 in U.S. dollars; he originally stated the money was from the U.S. government but later recanted once Faisal asked for the statement in writing. After trying in vain to receive official recognition for the attack from elected officials, Plaintiffs now turn to the courts.

Plaintiffs allege Salem and Waleed were collateral damage in a "signature strike," an attack where the U.S. targets an unidentified person (here, the three men) based on a pattern of suspicious behavior as identified through metadata. Plaintiffs further claim "the drone operator(s) waited until Salem and Waleed joined the three [men] to strike," JA 40, in violation of international law, since there was ample opportunity to strike when the men were (1) alone in the Yemeni countryside where they could be targeted without fear of civilian casualties or (2) in locations where Yemeni officials could easily take them into custody.

Shortly after this lawsuit was filed, the government successfully moved under the Westfall Act, 28 U.S.C. § 2679, to substitute the United States for the named defendants as to all counts except those under the TVPA. Thereafter, the government moved to dismiss this action for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. The district court granted the motion on Federal Rule of Civil Procedure 12(b)(1) grounds. It held, while Faisal had "next friend" standing to bring suit on Plaintiffs' behalf, Plaintiffs' claims were nonetheless barred

on political question grounds. The district court further stated, "[P]laintiffs' claims would [also] face insurmountable barriers on the merits" since "previous exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief" and the TVPA "does not authorize suits against U.S. officials." JA 62 n.6. Plaintiffs timely appealed.

## II.

The "first and fundamental question" this Court is "bound to ask and answer" is whether it has jurisdiction to decide this case. *Steel Co. v. Citizens for a Better Env't*., 523 U.S. 83, 94 (1998). The political question doctrine concerns the jurisdictional "'case or controversy' requirement" of Article III of the Constitution, *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 215 (1974); *see also Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006), and the Court must address it "*before* proceeding to the merits," *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (emphasis added).

"The nonjusticiability of a political question" as articulated by the Supreme Court "is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). The doctrine "excludes from judicial review," however sympathetic the allegations, "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The framework laid out by the Supreme Court in *Baker v. Carr* articulates the contours of the doctrine:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. Of course, "[t]o find a [nonjusticiable] political question, we need only conclude that one factor is present, not all," *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005); nonetheless, "[u]nless one of these formulations is inextricable from the case at bar," we may not dismiss the claims as nonjusticiable, *Baker*, 369 U.S. at 217. We must conduct "a discriminating analysis of the particular question posed" in the "specific case" before the Court to determine whether the political question doctrine prevents a plaintiff's claims from proceeding to the merits. *Id.* at 211.

## A.

Plaintiffs seek a declaration stating the drone strike that killed their relatives violated domestic and international law, an issue they claim courts are constitutionally required to decide. The government responds with this Court's *en banc* decision in *El-Shifa Pharmaceutical Industries Co. v. United*

*States*, 607 F.3d 836 (D.C. Cir. 2010). There, this Court held "[t]he political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion." *Id.* at 842. Here, *El-Shifa* controls; even "a statute providing for judicial review does not override Article III's requirement that federal courts refrain from deciding political questions." *Id.* at 843.

In *El-Shifa*, the Court addressed a U.S. retaliatory strike against "a factory in Sudan believed to be associated with the bin Ladin [terrorist] network and involved in the production of materials for chemical weapons." *Id.* at 838. The owners of the El-Shifa factory sued, alleging they were producing medicine for the Sudanese people, not chemical weapons, and arguing the strike was a mistake. They sought compensation for the destruction of their plant under the Federal Tort Claims Act ("FTCA") and the law of nations; they further asserted a cause of action in defamation based on U.S. government statements asserting the El-Shifa plant had ties to bin Ladin and functioned as part of his terror network. *Id.* at 839–40.

Following a panel decision affirming the district court on political question grounds, this Circuit voted to rehear the case *en banc*. *Id.* at 840. The full Court adopted a functional approach to the political question doctrine, distinguishing between nonjusticiable "claims requiring [courts] to decide whether taking military action was wise—a policy choice and value determination constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch"—and fully justiciable "claims presenting purely legal issues such as whether the government had legal authority to act." *Id.* at 842. Since the allegations in *El-Shifa*, set forth as

purely statutory claims, ultimately required the Court "to decide whether the United States' attack on the plant was mistaken and not justified" and "to determine the factual validity of the government's stated reasons for the strike," the Court held the case presented a nonjusticiable political question. *Id.* at 844. "If the political question doctrine means anything in the arena of national security and foreign relations, it means the courts cannot assess the merits of the President's decision to launch an attack on a foreign target, and the plaintiffs ask us to do just that." *Id.*; *see also Bancoult*, 445 F.3d at 437 ("The courts may not bind the executive's hands on [political questions], whether directly— by restricting what may be done—or indirectly—by restricting how the executive may do it.").

It would be difficult to imagine precedent more directly adverse to Plaintiffs' position. While Plaintiffs clearly assert claims under the TVPA and ATS, the precise grounds they raise in their Complaint call for a court to pass judgment on the wisdom of Executive's decision to commence military action—mistaken or not—against a foreign target. For example, the Complaint alleges:

- "[n]o urgent military purpose or other emergency justified" the drone strike, JA 10;
- killing the alleged targets was not "strictly unavoidable" to defend against an "imminent threat of death" to the "United States or its allies," JA 36–37; and
- the risk to nearby civilians was excessive in comparison to the military objective since "there [was] no evidence" the three men were "legitimate military targets," and "there were no U.S. or Yemeni forces or military objectives in the vicinity that were

in need of protection against three young Yemeni men," JA 38.

To resolve Plaintiffs' claims, a reviewing court *must* determine whether the U.S. drone strike in Khashamir was "mistaken and not justified." *El-Shifa*, 607 F.3d at 844. As *El-Shifa* warns, these questions are the province of the political branches, regardless of the statutes under which Plaintiffs may seek to sue. *See, e.g.*, *id.* (addressing an FTCA claim); *Gonzales-Vera v. Kissinger*, 449 F.3d 1260, 1264 (D.C. Cir. 2006) (noting a TVPA claim, "like any other, may not be heard if it presents a political question" and holding the same for claims under the ATS); *Schneider*, 412 F.3d at 197 (applying the political question doctrine to claims under the TVPA and FTCA because "recasting foreign policy and national security questions in tort terms does not provide standards for making or reviewing foreign policy judgments").

Plaintiffs will no doubt find this result unjust, but it stems from constitutional and pragmatic constraints on the Judiciary. In matters of political and military strategy, courts lack the competence necessary to determine whether the use of force was justified.

> The complex[,] subtle, and professional decisions as to the . . . control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.

*Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Put simply, it is not the role of the Judiciary to second-guess the determination

of the Executive, in coordination with the Legislature, that the interests of the U.S. call for a particular military action in the ongoing War on Terror. To be sure, courts have reviewed claims brought by individuals incarcerated at Guantanamo Bay on charges of terrorism and other war crimes. *See* Pls. Br. 25; *see also, e.g.*, *Al Bahlul v. United States*, 840 F.3d 757 (D.C. Cir. 2016) (en banc). But while "the political question doctrine does not preclude judicial review of prolonged Executive detention predicated on an enemy combatant determination," that is "because the Constitution specifically contemplates a judicial role in this area." *El-Shifa*, 607 F.3d at 848. There is, in contrast, "no comparable constitutional commitment to the courts for review of a military decision to launch a missile at a foreign target." *Id*. at 849.[1]

---

[1] While briefing in this case was pending, the Fourth Circuit decided *Al-Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147 (4th Cir. 2016). There, our sister circuit examined the conduct of private contractors conducting interrogations at Abu Ghraib prison as alleged by Iraqi individuals who claimed they had been incarcerated and tortured at that facility. The Fourth Circuit held "conduct by [private contractor defendants] that was unlawful when committed is justiciable, irrespective whether that conduct occurred under the actual control of the military," while "acts committed by [private contractor defendants] are shielded from judicial review under the political question doctrine if they were not unlawful when committed and occurred under the actual control of the military or involved sensitive military judgments." *Id.* at 151. The court's analysis—hinging upon whether the conduct of defendants was "lawful" or "unlawful"—puts the cart before the horse, requiring the district court to first decide the merits of a claim and, only thereafter, determine whether that claim was justiciable. *See Schneider*, 412 F.3d at 193 (confronting allegations the U.S. government had kidnapped, tortured, and killed an individual— obviously "unlawful" conduct—but stating at the outset "courts *lack jurisdiction* over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary") (emphasis added); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects

B.

Plaintiffs argue their reading of *El-Shifa* gains support from the Supreme Court's opinion in *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012), which held the political question did not bar judicial review of a claim attacking the constitutionality of a statute allegedly regulating the Executive. Again, Plaintiffs' claim fails.

In *Zivotofsky*, the Court considered a statute directing the Secretary of State, upon request, to issue a registration of birth or passport to a U.S. citizen born in Jerusalem that identified the individual's place of birth as "Jerusalem, Israel." *Id.* at 193. The President's signing statement asserted the statute, if it were construed as mandatory, would impermissibly interfere with the Executive's foreign relations powers. *Id.* at 192. Consequently, the U.S. Embassy later refused Zivotofsky's request to list his place of birth as Jerusalem, Israel and issued a passport and registration of birth listing only "Jerusalem." *Id.* at 193. The Supreme Court noted "the parties [did] not dispute the interpretation" of the statute, and the question before the Court concerned whether the statute was constitutional. *Id.* at 196. Accordingly, the Court held the question justiciable, reasoning Zivotofsky did not "ask the courts to determine whether Jerusalem is the capital of Israel" but sought only to vindicate his statutory right to have Israel designated as his place of birth on his passport. *Id.* at 195.

*Zivotofsky* confirms no *per se* rule renders a claim nonjusticiable solely because it implicates foreign relations. Rather, it recognizes that, in foreign policy cases, courts must first ascertain if "[t]he federal courts are . . . being asked to

_____

for judicial intervention."). Regardless, in this Circuit, *El-Shifa* and not *Al-Shimari* controls.

supplant a foreign policy decision of the political branches with the courts' own unmoored determination" or, instead, merely tasked with, for instance, the "familiar judicial exercise" of determining how a statute should be interpreted or whether it is constitutional. *Id.* at 196. In the latter case, the claim is justiciable. *Id.*; *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. at 229–30 (stating not "every case or controversy which touches foreign relations lies beyond judicial cognizance[,]" and emphasizing "courts have the authority to construe treaties[,] . . . executive agreements, and . . . congressional legislation" and to address other "purely legal question[s] of statutory interpretation" in the foreign policy realm). Therefore, if the court is called upon to serve as "a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security[,]" then the political question doctrine is implicated, and the court cannot proceed. *El–Shifa*, 607 F.3d at 842.

Zivotofsky sought only to enforce a statute alleged to directly regulate the Executive, and the reviewing court needed to determine only "if Zivotofsky's interpretation of the statute [was] correct, and whether the statute [was] constitutional." *Zivotofsky*, 566 U.S. at 196.[2] The Court was not called upon to impose its own foreign policy judgment on the political branches, only to say whether the congressional statute encroached on the Executive's constitutional authority. This is the wheelhouse of the Judiciary, and accordingly, it does not constitute a nonjusticiable political question. Here, however, Plaintiffs assert claims under the TVPA and ATS that would require the Court to second-guess the wisdom of the Executive's decision to employ lethal force against a

---

[2] On the merits, the Supreme Court later found Congress's directive unconstitutional. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015).

national security target—to determine, among other things, whether an "urgent military purpose or other emergency justified" a particular drone strike. JA 10. Indeed, Plaintiffs' request is more analogous to an action challenging the Secretary of State's independent refusal to recognize Israel as the rightful sovereign of the city of Jerusalem, a decision clearly committed to executive discretion.

## C.

Plaintiffs note the Executive has made a number of public statements and issued several memoranda setting forth its legal analysis justifying drone strikes and, presumably, defining the outer limits of when those strikes are appropriate. *See* PROCEDURES FOR APPROVING DIRECT ACTION AGAINST TERRORIST TARGETS LOCATED OUTSIDE THE UNITED STATES & AREAS OF ACTIVE HOSTILITIES 1 (May 22, 2013), *available at* https://www.aclu.org/sites/default/files/field_document/presidential_policy_guidance.pdf (unattributed internal policy memo detailing the Executive's internal rules regulating drone strikes outside of active war zones); *see also* U.S. DEP'T OF JUSTICE, LAWFULNESS OF A LETHAL OPERATION DIRECTED AGAINST A U.S. CITIZEN WHO IS A SENIOR OPERATIONAL LEADER OF AL-QA'IDA OR AN ASSOCIATED FORCE (Draft Nov. 8, 2011), *available at* https://www.documentcloud.org/documents/602342-draft-white-paper.html (articulating a "legal framework" for drone strike attacks); U.S. DEP'T OF JUSTICE, LEGALITY OF A LETHAL OPERATION BY THE CENTRAL INTELLIGENCE AGENCY AGAINST A U.S. CITIZEN (May 25, 2011), *available at* https://www.scribd.com/document/239101821/Redacted-White-Paper#fullscreen&from_embed (offering a legal basis for drone strikes conducted by the CIA). These Executive statements, however, do not constitute an invitation to the Judiciary to intrude upon the traditional executive role. *See*

*Schneider*, 412 F.3d at 193 ("[C]ourts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary.").

The George W. Bush and Barack Obama Administrations may have laid out the legal rules they understood to govern their conduct, but they did not concede authority to the Judiciary to enforce those rules. Nor could they. While an Executive may self-regulate during his term in office, it is the courts, and not executive branch attorneys, that possess the power to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And it is the Executive, and not a panel of the D.C. Circuit, who commands our armed forces and determines our nation's foreign policy. As explained at length above, courts are not constitutionally permitted to encroach upon Executive powers, even when doing so may be logistically, if not constitutionally, manageable.

For example, when reviewing the Secretary of State's designation of a group as a "foreign terrorist organization" under the Antiterrorism and Effective Death Penalty Act, the D.C. Circuit held it may constitutionally decide whether the government has followed the proper procedures, whether the organization is foreign, and whether it has engaged in terrorist activity, *but not* whether "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." *People's Mojahedin Org. of Iran v. U.S. Dep't of State* (*PMOI*), 182 F.3d 17, 21–24 (D.C. Cir. 1999) (quoting 8 U.S.C. § 1189(a)(1)(C)). The Court held the last criterion—however straightforwardly articulated—presented a nonjusticiable political question because the Secretary's determination of whether the terrorist activities at issue constituted threats to the U.S. "are political judgments, 'decisions of a kind for which the Judiciary has neither aptitude, facilities nor

responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.'" *Id.* at 23 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)).

## III.

In short, *El-Shifa* controls the Court's analysis here and compels dismissal of Plaintiffs' claims. To borrow a closing line, "Under the political question doctrine, the foreign target of a military strike cannot challenge in court the wisdom of [that] military action taken by the United States. Despite their efforts to characterize the case differently, that is just what the [P]laintiffs have asked us to do. The district court's dismissal of their claims is [a]ffirmed." *El-Shifa*, 607 F.3d at 851.

*So ordered.*

BROWN, *Circuit Judge*, concurring: Theory holds that courts must apply the political question doctrine to circumstances where decision-making, and the constitutional interpretation necessary to that process, properly resides in the political branches of government. But theory often does not correspond with reality. The world today looks a lot different than it did when the Supreme Court decided *Baker v. Carr*, 369 U.S. 186 (1962). Our latest phase in the evolution of asymmetric warfare continues to present conundrums that seem to defy solution. Today, the Global War on Terror has entered a new chapter—in part because of the availability of "sophisticated precision-strike technologies" like drones. Philip Alston, *The CIA & Targeted Killings Beyond Borders*, 2 HARV. NAT'L SEC. J. 283, 441 (2011). Yet the political question doctrine insures that effective supervision of this wondrous new warfare will not be provided by U.S. courts.

In other liberal democracies, courts play (or seem to play) a significant supervisory role in policing exercises of executive power. *See* Kristen E. Eichensehr, Comment, *On Target? The Israeli Supreme Court & the Expansion of Targeted Killings*, 116 YALE L.J. 1873, 1873 (2007) (noting the Israeli Supreme Court had authored the "world's first judicial decision on targeted killings," holding "terrorists are civilians under the law of armed conflict and thus are lawfully subject to attack only when they directly participate in hostilities"). In this country, however, strict standing requirements, the political question doctrine, and the state secrets privilege confer such deference to the Executive in the foreign relations arena that the Judiciary has no part to play. These doctrines may be deeply flawed. In fact, I suspect that technology has rendered them largely obsolete, but the Judiciary is simply not equipped to respond nimbly to a reality that is changing daily if not hourly.

2

I.

In November 2001, the United States launched its first armed drone strike in Afghanistan, targeting Mullah Akhund, the Taliban's number three in command; the attack missed him but killed several others. Michael C. Horowitz et al., *Separating Fact from Fiction in the Debate Over Drone Proliferation*, 41 INT'L SECURITY 7, 7 (2016). The following year, the United States conducted a drone strike in Yemen targeting Qa'id Salim Sinan al Harithi, an al-Qaeda operative suspected of plotting the attack against the U.S.S. Cole in 2000. *Id.* Thereafter, the strikes grew both in number and geographic scope, "extending to Pakistan in 2004 and Somalia in 2007," for a total of approximately 50 counterterrorism strikes during the Bush Administration. *Id.* In July 2016, the Obama Administration reported 473 counterterrorism strikes against terrorist targets outside areas of active hostilities—largely consisting of missiles launched from drones—had killed between 2,372 and 2,581 members of terrorist groups as well as 64 to 116 non-combatants. OFFICE OF THE DIR. OF NAT'L INTELLIGENCE, SUMMARY OF INFORMATION REGARDING U.S. COUNTERTERRORISM STRIKES OUTSIDE AREAS OF ACTIVE HOSTILITIES 1 (July 1, 2016), *available at* https://www.dni.gov/files/documents/Newsroom/ Press%20Releases/DNI+Release+on+CT+Strikes+Outside+A reas+of+Active+Hostilities.PDF (reporting figures for the period beginning January 20, 2009 and ending December 31, 2015). Even the government acknowledges the "inherent limitations" in its ability to calculate the precise effect of these strikes, and it admits the number of non-combatant deaths could be closer to 900. *Id*. at 2. Non-governmental sources offer substantially higher estimates. *See* Br. for Brandon Bryant, et al. as Amici Curiae Supporting Appellants 7 ("Serving in the Air Force, amici witnessed widespread and deliberate misclassification of deaths as 'enemy kills.' In

situations where targets were unknown, they were often classified as 'enemy kills.'"); Daniel Byman, *Why Drones Work: The Case for Washington's Weapon of Choice*, 92 FOREIGN AFFAIRS 32, 35–36 (2013) (citing studies).

More recently, the drone program—run jointly by the Central Intelligence Agency ("CIA") and the Joint Special Operations Command ("JSOC") at the Department of Defense—has expanded to include "signature strikes," such as the one that allegedly killed Salem and Waleed, where the government targets anonymous suspected militants solely based on their observed pattern of behavior. *Id*. at 36. This practice does not confine targets to high-level al-Qaeda operatives, and the targets of the strikes are often unknown to U.S. intelligence. Rather, signature strikes target unidentified individuals based on where they live, who they associate with, and whether they engage in behavior commonly associated with militants. Indeed, even after a signature strike is complete, the government still does not know "the precise identities of who [was] killed." Dan de Luce & Paul McLeary, *Obama's Most Dangerous Drone Tactic Is Here To Stay*, FOREIGN POL'Y (Apr. 5, 2016), http://foreignpolicy.com/2016/04/05/obamas-most-dangerous-drone-tactic-is-here-to-stay/.

Drones are an unquestionably effective way to wage war against geographically-isolated targets. In addition to providing unparalleled levels of surveillance, they have killed many al-Qaeda leaders, denied sanctuary to terrorist groups, and encumbered communication among those seeking to plot attacks. All this at low financial cost, zero risk of harm to U.S. forces, and "fewer civilian casualties than many alternative methods." Byman, *supra*, at 32.[1] On a more

---

[1] Perhaps unsurprisingly, the drone program's push-button war is politically popular. In 2015, the most recent survey results available, 58%

sinister note, lethal drone strikes avoid the complexities of dealing with live terrorist prisoners—judicial review alone requires a costly trial, complete with due process protections, followed by prospects for protracted appeal and habeas attempts. *See id.* at 34 ("It has become more politically palatable for the United States to kill rather than detain suspected terrorists."). One commentator went so far as to say the Executive has "adopted a de facto 'kill not capture' policy" when confronting the terrorist threat. David Rohde, *The Obama Doctrine*, 192 FOREIGN POL'Y 64, 68 (2012). One thing is clear: the current generation of drone technology presents political and operational advantages that, all else equal, encourages the use of military force. Horowitz, *supra*, at 22.

## II.

*El-Shifa Pharmaceutical Industries Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010) (en banc), sensibly holds that a court should not second-guess an Executive's decision about the appropriate military response—avoiding the need for boots on the ground, for example—to address a singular threat that might occur once or twice at widely separated intervals. Its doctrine, however, seems a wholly inadequate response to an executive decision—deployed through the CIA/JSOC targeted killing program—implementing a standard operating procedure that will be replicated hundreds if not thousands of times.

---

of Americans approved of U.S. drone strikes, and only 35% disapproved. *Public Continues To Back U.S. Drone Attacks*, PEW RESEARCH CTR. (May 28, 2015), http://www.people-press.org/2015/05/28/public-continues-to-back-u-s-drone-attacks/. The study further found 48% of Americans were very concerned drone strikes could endanger lives of innocent civilians and only 29% were very concerned about whether the strikes were being conducted legally. *Id.*

Addressing these two markedly different scenarios through a shared legal framework is simply impossible, and yet it is precisely what our precedent demands. To the extent the military sees itself as merely continuing the war declared on the U.S. by other means, the drone program may take the war to the enemy. Thus, anyone who credibly represents a threat can be targeted, and, as when armies actually clash, a certain amount of collateral damage is inevitable. *See id.* On the other hand, CIA/JSOC signature strike activities are covert (at least until the missile finds its target) and intended to develop intelligence that allows the U.S. to anticipate threats to interests at home and abroad. The rules of that game are tacitly assumed to be unknown. Courts are ill-equipped "to assess the nature of battlefield decisions" or "to define the standard for the government's use of covert operations in conjunction with political turmoil in another country." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 45 (D.D.C. 2010).

Of course, this begs the question: if judges will not check this outsized power, then who will? No high-minded appeal to departmentalism, arguing "each [branch] must in the exercise of its functions be guided by the text of the Constitution according to [that branch's] own interpretation of it," E. BURNS, JAMES MADISON: PHILOSOPHER OF THE CONSTITUTION 187 (reprinted 1968), changes the fact that every other branch of government seems to be passing the buck. The President is the most equipped to police his own house. *See generally* AKHIL REED AMAR, AMERICAN'S CONSTITUTION: A BIOGRAPHY 60–63 (2005) (discussing the President's independent obligation to ensure his actions comply with the Constitution). But, despite an impressive number of executive oversight bodies, there is pitifully little oversight within the Executive. Presidents are slow to appoint members to these boards; their operations are shrouded in

secrecy; and it often seems the boards are more interested in protecting and excusing the actions of agencies than holding them accountable. Congress, perhaps? *See generally* Frank H. Easterbrook, *Presidential Review*, 40 CASE W. RES. L. REV. 905, 912 (1990) ("If Congress enacts a War Powers Act and the President goes his merry way in reliance on a more expansive view of executive power (and a stingy view of legislative power), Congress need not give up."). But congressional oversight is a joke—and a bad one at that. Anyone who has watched the zeal with which politicians of one party go after the lawyers and advisors of the opposite party following a change of administration can understand why neither the military nor the intelligence agencies puts any trust in congressional oversight committees. They are too big. They complain bitterly that briefings are not sufficiently in-depth to aid them in making good decisions, but when they receive detailed information, they all too often leak like a sieve.

Our democracy is broken. We must, however, hope that it is not incurably so. This nation's reputation for open and measured action is our national birthright; it is a history that ensures our credibility in the international community. The spread of drones cannot be stopped, but the U.S. can still influence how they are used in the global community—including, someday, seeking recourse should our enemies turn these powerful weapons 180 degrees to target our homeland. The Executive and Congress must establish a clear policy for drone strikes and precise avenues for accountability.

Civilizational peril comes in many forms—sometimes malevolent philosophies, sometimes *hostis humanis generis* (pirates, slavers, and now terrorists), and in each epoch we must decide, like Thomas More in Robert Bolt's *A Man for All Seasons*, what must be preserved:

> ROPER:  So now you'd give the Devil benefit of law!
>
> MORE:  Yes!  What would you do?  Cut a great road through the law to get after the Devil?
>
> ROPER:  I'd cut down every law in England to do that!
>
> MORE:  Oh?  And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat?  This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down—and you're just the man to do it—d'you really think you could stand upright in the winds that would blow then?  Yes, I'd give the Devil benefit of law, for my own safety's sake.

ROBERT BOLT, A MAN FOR ALL SEASONS 37–38 (1960).  The Court's opinion has not hacked down any laws, though we concede the spindly forest encompassing the political question doctrine provides poor shelter in this gale.  But it is all a Judiciary bound by precedent and constitutional constraints may permissibly claim.  It is up to others to take it from here.