# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 9, 2020    Decided June 19, 2020

No. 19-7017

SIMON BRONNER, DERIVATIVELY ON BEHALF OF NOMINAL
DEFENDANT THE AMERICAN STUDIES ASSOCIATION, ET AL.,
APPELLANTS

v.

LISA DUGGAN, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00740)

*Jerome M. Marcus* argued the cause for appellants. With him on the briefs was *Jennifer Gross. Aviva Vogelstein* entered an appearance.

*Thomas C. Mugavero* argued the cause for appellees. With him on the joint brief was *Mark Allen Kleiman*, *Maria C. LaHood* and *Shayana D. Kadidal*. *John J. Hathway* entered an appearance.

Before: HENDERSON, GRIFFITH and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Four professors of American studies—Simon Bronner, Michael Rockland, Michael Barton and Charles Kupfer (collectively, Professors)—sued the American Studies Association (ASA) and individual ASA leaders after the ASA endorsed a boycott of Israeli academic institutions. They allege that the individual defendants breached various statutory, contractual and fiduciary duties in connection with the boycott. After the district court dismissed their *ultra vires* claim and all derivative claims brought on the ASA's behalf, the Professors filed a second amended complaint. Although the district court initially ruled that the amount in controversy supported federal diversity jurisdiction, it ordered additional briefing to address lingering concerns and, nearly three years after the suit was filed, concluded to a legal certainty that the Professors could not in fact satisfy the amount-in-controversy requirement. The court therefore dismissed the action for want of subject-matter jurisdiction. For the reasons that follow, the district court did not err in revisiting its jurisdictional determination, applying the legal certainty test or valuing the amount in controversy. Accordingly, we affirm.

## I. Background

The ASA, a nonprofit organization incorporated in the District of Columbia (D.C.), "is the nation's largest and oldest organization dedicated to the promotion of the study of American culture." J.A. 115. Primarily comprised of professors and scholars, the ASA facilitates intellectual discourse by, among other things, hosting conferences and sponsoring academic publications. It has also long advocated for its members and for American studies in general by adopting public positions on important issues, many of which are politically charged. For example, the ASA has taken a stance

on such topics as the Iraq War, wealth inequality and unionized hotels, to name a few.

At the ASA's annual meeting in November 2013, ASA leadership introduced a resolution to involve the ASA in a boycott of Israeli academic institutions.[1] According to the Professors, the boycott movement politicized the ASA and "subvert[ed] . . . [its] scholarly purpose." J.A. 109. Despite their strong opposition, the resolution was deemed approved following a vote of the ASA membership.

The Professors allege that, starting in 2012, over one year before the November 2013 meeting, the individual defendants—all current or former members of the ASA National Council[2] or key ASA committees—perpetrated a scheme to push the resolution through the ASA. They contend the defendants are leaders of, or at least sympathetic to, the United States Campaign for the Academic and Cultural Boycott of Israel and engaged in a coordinated effort to place boycott sympathizers in ASA leadership positions, all the while concealing their agenda from the general membership. But when the National Council failed to unanimously adopt the boycott resolution, the measure was put to a vote of the membership at large. The defendants then purportedly took

---

[1] The resolution outlined the ASA's "commit[ment] to the pursuit of social justice" and, after noting the lack of "effective or substantive academic freedom for Palestinian students and scholars under conditions of Israeli occupation," resolved to "honor the call of Palestinian civil society for a boycott of Israeli academic institutions" and "support[] the protected rights of students and scholars everywhere to engage in research and public speaking about Israel-Palestine." J.A. 23.

[2] The National Council is the ASA's governing body. *See Governance*, AM. STUDIES ASS'N, https://www.theasa.net/about/governance (last visited June 3, 2020).

steps to manipulate the vote in their favor. They recruited students to join the ASA—ostensibly to vote in favor of the boycott—but froze the ASA membership rolls before the vote was publicly announced, which prevented some members, including plaintiff Barton, from voting on the resolution. [3] Finally, the resolution was treated as if it passed, despite failing to garner the requisite two-thirds vote.

According to the Professors, the ASA has suffered myriad economic and reputational harms as a consequence of the boycott resolution. Specifically, they contend the ASA incurred substantial expenses promoting and defending the boycott while, at the same time, revenue from donations and membership fees declined following its adoption. Dues were thereafter raised by, at most, $155 per year, J.A. 173–74, and, to cover the remaining shortfall, the Professors claim the individual defendants improperly invaded the ASA's Trust and Development Fund to pay for boycott-related public relations and legal fees,[4] *see* Professors' Br. 10–11.

The Professors' attempts to obtain voluntary redress proved unsuccessful and they filed suit in the United States District Court for the District of Columbia on April 20, 2016. Their first amended complaint brought derivative claims, on behalf of the ASA, against the individual defendants for breach

---

[3] Barton's membership lapsed in 2012 for nonpayment of dues. Although Barton paid all outstanding dues and was accepted back into the ASA, he was not permitted to vote on the resolution because his membership was reinstated *after* the annual meeting. Yet at least one other person who likewise paid dues in December 2013 *was* permitted to vote.

[4] The defendants point out that, at least with respect to the ASA's legal expenditures, "these alleged withdrawals would never have been necessary" but for the Professors' "continued litigation efforts." Appellees' Br. 32.

of fiduciary duties, *ultra vires* acts and corporate waste, and direct claims for *ultra vires* acts, corporate waste, breach of the District of Columbia Nonprofit Corporations Act of 2010, D.C. CODE §§ 29-401.01 *et seq.*, and breach of contract. The Professors sought damages as well as declaratory and injunctive relief.

After finding that the Professors' "claims plainly me[t] the low standard for establishing a sufficient amount in controversy," *Bronner v. Duggan* (*Bronner I*), 249 F. Supp. 3d 27, 38 (D.D.C. 2017),[5] thus satisfying the requirements for federal diversity jurisdiction,[6] the district court granted in part the defendants' motion to dismiss. First, the court dismissed all derivative claims. *Id.* at 37. Under D.C. Code § 29-411.03, a derivative proceeding may be commenced only after a demand to take suitable action has been made on the nonprofit corporation and ninety days have expired from the demand's effective date. The Professors, however, filed suit only two days after delivering a formal demand letter and did not demonstrate that a pre-suit demand would have been futile. *Bronner I*, 249 F. Supp. 3d at 45. Next, the district court dismissed the direct *ultra vires* claim under Federal Rule of Civil Procedure 12(b)(6) because the Professors had not pleaded facts showing that the boycott resolution was contrary

---

[5] The Professors did not quantify their damages but "assert[ed] that over $75,000 is in controversy in the case, albeit in a cursory fashion." *Bronner I*, 249 F. Supp. 3d at 38.

[6] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs" and is between citizens of different states. 28 U.S.C. § 1332(a). Here, the parties do not dispute diversity of citizenship so the district court focused solely on the $75,000 jurisdictional threshold. *Bronner I*, 249 F. Supp. 3d at 37.

to the ASA's express purposes or otherwise violated any D.C. statute or ASA bylaw. *Id.* at 47–50.

The Professors moved for leave to file a second amended complaint, asserting several new claims and adding four defendants who held senior ASA leadership roles. In total, they alleged nine counts based on breach of fiduciary duties, *ultra vires* acts, breach of contract, corporate waste and breach of the D.C. Nonprofit Corporations Act. The district court granted leave to file on March 6, 2018, and simultaneously invoked the "continuing duty to examine its subject matter jurisdiction." *Bronner v. Duggan* (*Bronner II*), 324 F.R.D. 285, 294 (D.D.C. 2018) (citing *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)). The court noted that, notwithstanding the parties did "not explicitly readdress[] subject matter jurisdiction in their latest round of motions," the filings nevertheless "raised certain issues" implicating the amount in controversy, namely, whether the individual defendants could be held liable for damages. *Id.* The D.C. Nonprofit Corporations Act provides that directors [7] of a charitable corporation are not liable to the corporation or its members for money damages when acting in an official capacity, except in four specific instances. [8] *See* D.C. CODE § 29-406.31(d). Thus, if the individual defendants are immune from damages

---

[7] The district court construed the ASA National Council as "equivalent to a Board for Directors." *Bronner II*, 324 F.R.D. at 294 (citing D.C. CODE § 29-401.02(1) ("'Board' or 'board of directors' means the group of individuals responsible for the management of the activities and affairs of the nonprofit corporation, regardless of the name used to refer to the group.")).

[8] Directors may be held liable for: "(1) [t]he amount of a financial benefit received by the director to which the director is not entitled; (2) [a]n intentional infliction of harm; (3) [a] violation of § 29-406.33; or (4) [a]n intentional violation of criminal law." D.C. CODE § 29-406.31(d).

liability, "it would in fact be legally impossible for [the Professors] to recover $75,000." *Bronner II*, 324 F.R.D. at 294.

The district court reaffirmed its jurisdiction following supplemental briefing. *See Bronner v. Duggan* (*Bronner III*), 317 F. Supp. 3d 284, 289 (D.D.C. 2018). Because the Professors sufficiently alleged that the challenged conduct constituted "[a]n intentional infliction of harm," *id.* at 291 (quoting D.C. CODE § 29-406.31(d)(2)), the individual defendants were "not shielded from damages by D.C. Code § 29-406-31(d)," *id.* at 294. But the court itself acknowledged that the ruling was not necessarily final, concluding that "jurisdiction remain[ed] intact, *for now*." *Id.* at 289 (emphasis added). On the contrary, the district court teed up future jurisdictional challenges, declaring that if it is "true as a matter of law that [the Professors] . . . cannot seek damages on behalf of the ASA," *id.* at 290 n.5, their failure "to explain how they have individually suffered more than $75,000 in damages, or why complying with an injunction would cost the ASA more than that amount," was all the more problematic, *id.* at 289 n.2. Given these concerns, the court committed to "again reexamine its subject matter jurisdiction" if properly "raised in a well-fashioned motion to dismiss or motion for summary judgment." *Id.* at 290 n.5.

Heeding this invitation, the defendants filed a motion to dismiss, which was granted on February 4, 2019. *See Bronner v. Duggan* (*Bronner IV*), 364 F. Supp. 3d 9, 23 (D.D.C. 2019). The Professors' inability to "bring a derivative action on ASA's behalf under District of Columbia law," *id.* at 20, did not foreclose the recovery of "damages arising from injuries they suffered directly," *id.* at 17. But because the Professors had "failed to demonstrate that the value of the injunctive and declaratory relief they seek, combined with those damages, exceeds $75,000," it "appear[ed] to a legal certainty" that they

could not satisfy the amount-in-controversy requirement. *Id.* The action was therefore dismissed for lack of subject-matter jurisdiction and the Professors timely appealed.

Although they also challenge the dismissal of the *ultra vires* claim in the first amended complaint, the crux of the Professors' appeal is that the ultimate jurisdictional determination was in error, inasmuch as the district court had originally found the amount-in-controversy requirement satisfied. "We review *de novo* a dismissal for lack of subject-matter jurisdiction." *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018).

## II. Subject-Matter Jurisdiction

Article III of the Constitution prescribes that "[f]ederal courts are courts of limited subject-matter jurisdiction" and "ha[ve] the power to decide only those cases over which Congress grants jurisdiction." *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012) (citing *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151 (D.C. Cir. 2010)); *see Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) ("Only Congress may determine a lower federal court's subject-matter jurisdiction." (citing U.S. CONST. art. III, § 1)). Exercise of the judicial power therefore begets a corresponding "obligation to ensure that [federal courts] do not exceed the scope of their jurisdiction." *Henderson*, 562 U.S. at 434. To fulfill this obligation, courts must consider the barriers to federal adjudication the Congress has erected.

In cases based on diversity of citizenship, the "Congress has further narrowed our jurisdiction by periodically increasing the amount-in-controversy minimum." *Spielman v. Genzyme Corp.*, 251 F.3d 1, 4 (1st Cir. 2001). "Subject-matter limitations" such as this "must be policed by the courts on their own initiative," *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S.

574, 583 (1999), and, once jurisdiction is in question, "the party claiming subject matter jurisdiction"—here, the Professors—"has the burden to demonstrate that it exists." *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) (citing *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007)).

The Professors' jurisdictional arguments can be summarized as follows. First, it was improper for the district court to revisit the amount in controversy and conclude instead, nearly three years after the suit was filed and contrary to its initial findings, that the Professors failed to satisfy this necessary element of federal diversity jurisdiction. And, in so doing, the court incorrectly applied the "legal certainty" standard. Second, the district court erred in valuing the amount in controversy. We address their arguments in turn.

## A. Revisiting Jurisdiction

The general rule to assess whether the amount in controversy exceeds the threshold for federal diversity jurisdiction is that "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted). To warrant dismissal, then, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount," although "[e]vents occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction." *Id.* at 289–90. Put differently, federal courts are not divested of jurisdiction simply because a valid defense exists, the district court's rulings have reduced the amount recoverable or the plaintiff is otherwise unable to recover an amount sufficient to support jurisdiction. *Id.* at 289, 292. *But see Stevenson v. Severs*, 158 F.3d 1332, 1334 (D.C. Cir. 1998) (per curiam)

(noting that when the claim on which original jurisdiction has vested is dismissed, the district court may exercise discretion in deciding whether to keep the remaining claims based on its authority under 28 U.S.C. § 1367(c)(3)).

From this, the Professors argue that their place in federal court was cemented in 2017 when the district court concluded it was "far from legally certain that [they] could not recover over $75,000." *Bronner I*, 249 F. Supp. 3d at 38. As they see it, the district court erred when, nearly two years later, it found "to a legal certainty" that the Professors could not in fact satisfy the amount-in-controversy requirement. *Bronner IV*, 364 F. Supp. 3d at 17. And because dismissal was predicated on their "lack [of] standing to seek damages arising from ASA's alleged injuries," *id.*, the Professors contend this "ruling[] of the district court" that "reduce[d] the amount recoverable below the jurisdictional requirement," *St. Paul Mercury*, 303 U.S. at 292, is a subsequent event incapable of divesting jurisdiction, *see id.* at 289–90. They also identify numerous purported errors in the district court's application of *St. Paul Mercury*'s "legal certainty" standard.

As an initial matter, we address the Professors' argument that the district court improperly reassessed jurisdiction in light of the allegations contained in the second amended complaint. They invoke the principle that "[t]he amount in controversy for federal diversity jurisdiction purposes is determined as of the time the action is commenced," *Worthams v. Atlanta Life Ins. Co.*, 533 F.2d 994, 997 (6th Cir. 1976), which reflects *St. Paul Mercury*'s concern that jurisdiction, once properly acquired, should not depend on whether the plaintiff is ultimately entitled to the jurisdictional amount, *cf. Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."). It makes sense to focus on the

claims set out in the complaint, instead of the plaintiff's actual recovery; "[o]therwise every diversity case that a plaintiff lost on the merits would be dismissed for lack of federal jurisdiction, allowing the plaintiff to start over in state court." *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1121 (7th Cir. 1998).

But there are different concerns implicated by the filing of an amended complaint and the Professors' position runs headlong into the Supreme Court's more recent direction that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007). It is true, as the Professors point out, that *Rockwell* did not involve an amount-in-controversy dispute. But they cite no authority to support their claim that this distinction necessarily cabins *Rockwell*'s reach and, in fact, they appear to have conceded *Rockwell*'s applicability here. *See* Oral Arg. at 1:58 ("Our amended complaint is the complaint we're talking about.").

Moreover, *St. Paul Mercury* was a removal case, which "raise[s] forum-manipulation concerns that simply do not exist when it is the *plaintiff* who chooses a federal forum." *Rockwell*, 549 U.S. at 474 n.6. The worry that a plaintiff will attempt to "prevent removal[] by forswearing any effort to collect more than the jurisdictional threshold" does not obtain in that circumstance. *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011) (citing, *inter alia*, *St. Paul Mercury*, 303 U.S. at 291). At the same time, when a suit is instituted in state court, "[t]here is a strong presumption that the plaintiff has not claimed a large amount in order to confer jurisdiction on a federal court." *St. Paul Mercury*, 303 U.S. at 290. Taken together, these considerations counsel that in a removal case we look to the plaintiff's original complaint, not

post-removal amendments. But for a case like this one, "filed originally in federal court," normal jurisdictional "principles generally function as expected." *In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 101 (2d Cir. 2015); *see also Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 507–08 (5th Cir. 1985) (forum-manipulation concerns "are not present" when "the plaintiff, rather than the defendant, is invoking the jurisdiction of the federal court[,] . . . because the burden is on the plaintiff to establish jurisdiction in the first instance . . . ."). We therefore affirm that, under *Rockwell*, it was not error for the district court to revisit the amount in controversy based on the second amended complaint.

The Professors nevertheless assert that the good-faith sum claimed in the second amended complaint established federal jurisdiction. Indeed, the district court initially said as much. After the second amended complaint was filed, the court concluded, "at th[at] stage, it [wa]s legally possible that [the Professors] could recover more than $75,000 if they prevail." *Bronner III*, 317 F. Supp. 3d at 289. At the same time, however, the court acknowledged that if the Professors could not in fact recover damages from the individual defendants—an unanswered question at that point—"it would be legally impossible for [them] to recover $75,000." *Id.* The court's approach—temporarily affirming jurisdiction while simultaneously identifying potential defects for future resolution—caused it and the parties to "dance[] around the key issue . . . for multiple rounds of briefing and opinions." *Bronner IV*, 364 F. Supp. 3d at 17. Although we may disagree that the extended inquiry evinced the smooth coordination of a "waltz . . . reach[ing] its crescendo," *id.*, we find no error in the decision to prolong adjudication of this threshold question. As we stated over forty years ago, "the district court may question at any time whether the jurisdictional amount has been shown." *King v. Morton*, 520 F.2d 1140, 1145 (D.C. Cir. 1975) (citing

*McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." (citation omitted)).

Even so, the Professors argue that the district court's *volte face* in its tentative jurisdictional assessment reflects an erroneous application of *St. Paul Mercury*'s legal certainty standard. They assert that once the amount-in-controversy requirement has been deemed fulfilled, the district court must "find that the legal certainty test is satisfied *and* that the plaintiffs' allegations in the complaint were made in bad faith" before dismissing the action for failure to exceed the $75,000 jurisdictional threshold. Professors' Reply Br. 8. And, because their allegations were not made in bad faith, they contend the district court was foreclosed from overruling its earlier amount-in-controversy determination. The Professors' position stretches *St. Paul Mercury* too far.

Although *St. Paul Mercury*'s "primary concern" may be "the plaintiff's 'good faith' in alleging the amount in controversy," *Coventry Sewage Assocs. v. Dworkin Realty Co.*, 71 F.3d 1, 6 (1st Cir. 1995), the opinion also makes clear that

> if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, . . . the suit will be dismissed,

*St. Paul Mercury*, 303 U.S. at 289. This "latter passage appears to render irrelevant whether the plaintiff exercised good faith in pleading entitlement to recover the jurisdictional amount

when it is clear 'to a legal certainty' that he cannot recover a sufficient amount." *Esquilin-Mendoza v. Don King Prods., Inc.*, 638 F.3d 1, 4 (1st Cir. 2011). That is, "legal certainty . . . trumps the plaintiff's good faith." *Id.* (citation and internal quotation marks omitted). So even if the legal certainty test is intended to assess the plaintiff's "good faith in choosing the federal forum," *St. Paul Mercury*, 303 U.S. at 290; *cf. Jones v. Landry*, 387 F.2d 102, 104 (5th Cir. 1967) ("[G]ood faith and legal certainty are equivalents rather than two separate tests."), it adds an objective element to this inquiry, *see Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir. 1994). Put differently, "jurisdiction is defeated notwithstanding the plaintiff's good faith . . . if one familiar with the applicable law could not reasonably have concluded that the claim was worth the jurisdictional amount." *Esquilin-Mendoza*, 638 F.3d at 4. Relying solely on subjective good faith, as the Professors urge, would undercut the Supreme Court's instruction that good faith "is open to challenge . . . by the facts disclosed at trial" so that, if "it is clear . . . [the] claim never could have amounted to the sum necessary to give jurisdiction[,] there is no injustice in dismissing the suit."[9] *St. Paul Mercury*, 303 U.S. at 290; *see Tongkook*, 14 F.3d at 785 ("[W]hile [the plaintiff]'s subjective 'good faith' is one of the factors to assess in determining subject-matter jurisdiction, 'good faith' alone does not control where it is apparent that, 'to a legal certainty,' [the plaintiff] could not recover the requisite

---

[9] This language further supports our conclusion that the district court properly revisited its initial jurisdictional determination. In *St. Paul Mercury*, the Supreme Court held that dismissal is warranted if "it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed," not only "from the face of the pleadings" but also "from the proofs." 303 U.S. at 289. If, as the Professors contend, the district court was precluded from reassessing subject-matter jurisdiction in light of concerns identified during the course of litigation, this instruction would be rendered toothless.

jurisdictional amount . . . ."). We therefore decline to adopt their more restrictive articulation.

Setting aside, then, the Professors' subjective good faith, it is well accepted that the legal certainty test is satisfied "when a specific rule of substantive law or measure of damages limits the amount of money recoverable by the plaintiff to less than the necessary number of dollars to satisfy the requirement." 14AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3713 (4th ed. 2011). Although the Professors contend "there must be a *statute* that explicitly limits the amount available," Professors' Reply Br. 7, and that "the legal certainty test is almost never (if ever) satisfied where there are one or more tort claims," *id.* at 8, the case law does not corroborate their unsupported assertions. In *Esquilin-Mendoza*, for example, the First Circuit dismissed the plaintiff's tort action for lack of subject-matter jurisdiction because, despite her good faith in claiming approximately one million dollars in damages, "she ha[d] no legal entitlement to recover damages for any emotional or other injury caused by" the defendant. 638 F.3d at 2, 5. And her one plausible claim, relating to the defendant's delay in returning her vehicle, could not support a damages award even close to approaching the $75,000 threshold. *Id.* at 6.

To be clear, the issue is not whether the plaintiff is victorious once the dust settles. Success (or lack thereof) on the merits is not the linchpin of federal diversity jurisdiction. *Cf. Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 589 F.3d 881, 886 (7th Cir. 2009) ("The failure [to prove damages] is a failure on the merits rather than a failure of jurisdiction."). Instead, the concern is that the exercise of jurisdiction was erroneous in the first instance inasmuch as "the plaintiff *never* was entitled to recover" the requisite amount in controversy. *St. Paul Mercury*, 303 U.S. at 289 (emphasis

added); *see also, e.g.*, *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 628 (6th Cir. 2009) ("It appears to a legal certainty that '[a] claim is less than the jurisdictional amount where the applicable [] law bar[s] the type of damages sought by plaintiff.'" (alterations in original) (quoting *Rosen v. Chrysler Corp.*, 205 F.3d 918, 921 (6th Cir. 2000) (quotation marks omitted))); *McQueen v. Woodstream Corp.*, 672 F. Supp. 2d 84, 88 (D.D.C. 2009) ("If it becomes apparent during the course of litigation that from the outset the maximum conceivable amount in controversy was less than the jurisdictional minimum, the court must dismiss the case for lack of subject matter jurisdiction.").

Here, the district court held that the relevant substantive law precluded the Professors from obtaining relief on the ASA's behalf, *see Bronner IV*, 364 F. Supp. 3d at 20 (Professors "do not, and cannot, bring a derivative action . . . under District of Columbia law" and "failed to identify any other District of Columbia cause of action by which they can assert ASA's claims"), and, thus, it was "a legal certainty that [they] cannot collect the damages they claim ASA is owed," *id.* at 21. The Professors point once again to the district court's initial determination of jurisdictional sufficiency and construe this later ruling as a subsequent event incapable of divesting jurisdiction. Their argument relies on a distinction some courts have made "between subsequent events that change the amount in controversy"—which do not oust jurisdiction—"and subsequent revelations that, in fact, the required amount was or was not in controversy at the commencement of the action"— which do. *Jones v. Knox Expl. Corp.*, 2 F.3d 181, 183 (6th Cir. 1993) We need not travel far down that road, however.

The district court's ruling was just as correct when the suit commenced, notwithstanding it was rendered three years later. The lack of subject-matter jurisdiction, then, is not attributable

to the dismissal of claims during the course of litigation nor is it the product of changed circumstances "disclosed by an amended complaint, by application of a legal defense following discovery, or by evidence adduced at a trial." *Id.* Rather, it stems from the conclusion that the Professors *never* were entitled to collect certain damages. *Cf. id.* ("Since no subsequent event occurred to reduce the amount in controversy, this can only mean that the plaintiffs' claims never satisfied the jurisdictional requirement."). By answering a question that existed at the outset, the court's "ruling thus confirmed what had been apparent earlier: [the Professors'] attempt to meet the jurisdictional minimum was in vain from the beginning." *Spielman*, 251 F.3d at 6; *see Jones*, 2 F.3d at 183 ("[L]ack of the jurisdictional amount from the outset—although not recognized until later—is not a subsequent change that can be ignored." (quoting 1 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.92[1] (2d ed. 1993))). Accordingly, the district court did not err in applying *St. Paul Mercury*'s legal certainty test after initially finding the amount-in-controversy requirement satisfied. Because the district court properly revisited its jurisdiction, we proceed to address its finding that the Professors' "remaining claims do not raise an amount-in-controversy exceeding $75,000." *Bronner IV*, 364 F. Supp. 3d at 22.

## B. Determining the Amount in Controversy

The district court held that it was legally certain the Professors could not recover more than $75,000, accounting for their individual damages and the value of the requested injunctive and declaratory relief. *See id.* at 21. The Professors reject this assessment and maintain they adequately alleged an amount in controversy that exceeds the jurisdictional minimum. Specifically, they assert that the district court (1) erred in holding that the Professors could not seek damages on

behalf of the ASA, (2) incorrectly valued the claimed equitable relief and (3) failed to account for punitive damages. Their arguments are unavailing.

**1. Monetary Damages**

The second amended complaint seeks "[a]ctual damages on behalf of" the ASA, J.A. 190, and the Professors concede that "[t]hese damages are intended to make *the ASA* whole," Professors' Br. 38. Their attempt to recover monetary damages, not for injuries they have suffered personally, but for harms allegedly inflicted on the ASA by the individual defendants, would typically end our inquiry. Corporate shareholders are "generally prohibit[ed] . . . from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990). Instead, "[c]laims of corporate mismanagement must be brought on a derivative basis because no shareholder suffers a harm independent of that visited upon the corporation and the other shareholders." *Cowin v. Bresler*, 741 F.2d 410, 414 (D.C. Cir. 1984). This "so-called shareholder standing rule . . . is a longstanding equitable restriction," *Franchise Tax Bd.*, 493 U.S. at 336, reflecting the established tenet that "plaintiffs must demonstrate Article III standing by asserting their 'own legal rights and interests' rather than resting 'claim[s] to relief on the legal rights or interests of third parties,'" *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 814 (D.C. Cir. 2015) (alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)), *vacated on other grounds,* 137 S. Ct. 1312 (2017).

District of Columbia law applies the derivative-suit requirement to nonprofit corporations like the ASA. *See* D.C.

CODE §§ 29-411.01 *et seq.* It would appear, then, that the Professors are in a bind. They request damages for injuries incurred by the ASA yet, at the same time, maintain that the second amended complaint contains no derivative claims. In a "clever attempt to avoid this straightforward conclusion," *Bronner IV*, 364 F. Supp. 3d at 20, the Professors argue that they have nevertheless alleged cognizable direct claims. They principally rely on two District of Columbia cases—*Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723 (D.C. 2011), and *Jackson v. George*, 146 A.3d 405 (D.C. 2016)—that recognize "non-profit members may directly suffer certain injuries from organizational mismanagement that for-profit shareholders do not." *Bronner IV*, 364 F. Supp. 3d. at 21. But by framing *Daley* and *Jackson* as "hold[ing] that third-party and shareholder standing rules do not apply," Professors' Br. 42, the Professors stretch those decisions too far.

In *Daley*, members of the Alpha Kappa Alpha sorority sued the sorority, its affiliate foundation and certain officials, alleging that the officials had violated the organization's constitution and bylaws by making several large expenditures without first obtaining approval from the sorority's legislative body. 26 A.3d at 726. The plaintiffs sought to "restore those funds, enjoin the [officials] from taking any further action that would harm [the sorority], and restore their membership privileges." *Id.* at 727. The D.C. Court of Appeals declined to sanction an expansive application of the derivative-suit requirement in that context, noting the "uneasy fit" between nonprofit members, who fund the organization and are united by a shared social or charitable purpose, and traditional shareholders in for-profit corporations. *Id.* at 729. Indeed, certain of the court's language can be read to suggest that the payment of membership fees confers a personal stake sufficient to overcome third-party standing limitations:

> On its face, it would seem almost self-evident that members of a nonprofit organization whose revenue depends in large part upon the regular recurring annual payment of dues by its members have standing to complain when allegedly the organization and its management do not expend those funds in accordance with the requirements of the constitution and by-laws of that organization.

*Id.* At the same time, however, the court continued to emphasize that the plaintiffs must suffer *individualized* injuries entitling them to *personalized* relief. The plaintiffs could therefore directly bring breach of fiduciary duties, *ultra vires* and breach of contract claims because their "individual rights . . . were affected by the alleged failure to follow the dictates of the constitution and by-laws and they thus had a 'direct, personal interest' in the cause of action, even if 'the corporation's rights [were] also implicated.'" *Id.* (quoting *Franchise Tax Bd.*, 493 U.S. at 336).

The D.C. Court of Appeals revisited the issue in *Jackson*. There, the plaintiffs alleged that they were singled out for unfair treatment after a power struggle divided the trustees of Jericho Baptist Church Ministries, Inc. Specifically, they were barred from church property and from attending services and their tithes and offerings were purportedly used without authorization. 146 A.3d at 415. In affirming the trial court's holding that the plaintiffs had standing "to proceed on the claims they brought on their own behalves," the appellate court again highlighted the personalized nature of the plaintiffs' injuries, emphasizing the lower court's conclusion that the plaintiffs had "alleged an injury particularized to them and [had] a personal financial stake." *Id.* (quotation marks omitted).

Distilling *Daley* and *Jackson*, we believe members of D.C. nonprofit corporations may be able to assert certain direct claims that shareholders in for-profit corporations must pursue derivatively. That said, traditional third-party standing rules are not entirely displaced. Otherwise, D.C. Code §§ 29-411.01 *et seq.*, which outline the derivative-suit requirement for nonprofit corporations, would be rendered almost entirely meaningless. Rather, as the district court noted, the focus on individualized harms counsels that "*Daley* and *Jackson* concern a non-profit member's standing to seek relief based on the *member*'s injuries, but not a non-profit member's standing to seek relief based on the *non-profit*'s injuries." *Bronner IV*, 364 F. Supp. 3d at 21. Indeed, the district court held only that the Professors could not "collect the damages they claim *ASA is owed*," saying nothing about their ability to recover damages to themselves. *Bronner IV*, 364 F. Supp. 3d at 21 (emphasis added). On the contrary, it explicitly recognized that, under *Daley* and *Jackson*, they "may assert their claims directly and seek damages and injunctive relief for their individual injuries." *Id.*

The issue, then, is that the Professors appear to believe that, once they have standing to litigate a direct claim, they may thereafter rely on injuries to the ASA to satisfy the amount-in-controversy requirement. Not so. Despite the Professors' contention that their inability to recover on the ASA's behalf implicates the calculation of damages, not standing, the fact remains that they are attempting to rely on an *exception* to the more general rule that individuals lack standing to seek relief owed to a third party. And if a claim falls outside that exception, it is subject to the longstanding rule that shareholders may not enforce a corporation's rights absent "a direct, personal interest in [the] cause of action." *Franchise Tax Bd.*, 493 U.S. at 336. That nonprofit members have standing to press a suit to protect their own interests does not, in turn,

entitle them to vindicate interests held solely by the non-profit. *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[P]laintiff must demonstrate standing . . . for each form of relief that is sought." (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). It is clear, then, that the Professors may assert direct claims for personalized injuries allegedly inflicted by the individual defendants. They may not, however, utilize a direct claim as a Trojan horse to sneak derivative claims past the bulwarks of the federal courts.

We briefly note that the Professors cite the D.C. Superior Court's determination, in parallel litigation, that their claims are direct, not derivative. *See* Amended Order Granting in Part Motions to Dismiss at 25–28, *Bronner v. Duggan*, No. 2019 CA 1712 B (D.C. Super. Ct. Dec. 12, 2019). This ruling is not incompatible with the district court's decision, which found that the second amended complaint contains direct claims. Quite the opposite, it undercuts the Professors' argument by acknowledging that they "inappropriately seek derivative damages" and "may only proceed on the damages that they have personally suffered." *Id.* at 34. In sum, we find no error in the district court's conclusion that it is "a legal certainty that [the Professors] cannot collect the damages they claim ASA is owed." *Bronner IV*, 364 F. Supp. 3d at 21.

As for the Professors' individual injuries, it is evident that their resulting damages do not exceed the $75,000 jurisdictional threshold. They vaguely assert several personalized injuries: economic and reputational damage; manipulation of voting rights, both generally and against Barton; and, reading between the lines, mismanagement of membership fees and increased dues. This latter contention does not get them very far. Bronner and Rockland, as honorary lifetime members, do not owe dues and Kupfer has not paid dues since 2014. Moreover, as the district court pointed out,

even "[i]f Defendants misappropriated every dollar that [the Professors] contributed to ASA in annual dues, it would take each [Professor] 625 years to reach $75,000 in damages." *Bronner IV*, 364 F. Supp. 3d at 22. Their other claims fare no better. The Professors nowhere explain *how* they have suffered economic or reputational damage. They assert no loss of standing within their universities. They do not purport to have been denied tenure, promotions or other prestigious honors. Nor do they claim to have had their writings rejected by academic journals.

It is true that a plaintiff need not provide an exact valuation or detailed breakdown of damages at the outset of litigation, as the claimed sum controls if "apparently made in good faith." *St. Paul Mercury*, 303 U.S. at 288. But it does not follow that any unsupported claim will suffice. "While the 'legal certainty' test is an exacting one," *Martin v. Gibson*, 723 F.2d 989, 991 (D.C. Cir. 1983) (per curiam) (citing *King*, 520 F.2d at 1145), "we have emphasized that . . . the party asserting jurisdiction always bears the burden of establishing the amount in controversy once it has been put in question," *Rosenboro v. Kim*, 994 F.2d 13, 17 (D.C. Cir. 1993) (citing *Martin*, 723 F.2d at 991, 993); *see also Dep't of Recreation & Sports of P.R. v. World Boxing Ass'n*, 942 F.2d 84, 88 (1st Cir. 1991) ("Once challenged, . . . the party seeking to invoke jurisdiction has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount."). Although "the Supreme Court's yardstick demands that courts be very confident that a party cannot recover the jurisdictional amount before dismissing the case for want of jurisdiction," dismissal is warranted if, for example, the plaintiffs "submit[] *no* . . . evidence" supporting their alleged injury. *Rosenboro*, 994 F.2d at 17. The Professors have provided nothing beyond a bare-bones assertion of jurisdictional sufficiency to suggest that the monetary damages

arising from their direct claims even remotely approach $75,000. This is not enough to carry their burden and therefore the district court did not err in finding the Professors' claimed damages inadequate to satisfy the amount-in-controversy requirement.

**2. Equitable Relief**

The Professors requested an order declaring that the defendants breached their fiduciary duties and that the boycott vote was improper. They also asked the court to enjoin ASA leadership from (1) acting contrary to the ASA constitution; (2) taking any action to enforce the boycott; and (3) making any unauthorized payments, including in support of the boycott. As with monetary damages, a complaint seeking declaratory or injunctive relief should not be dismissed unless it appears "to a legal certainty" that the claims will not exceed the minimum amount in controversy. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 346 (1977) (citing *St. Paul Mercury*, 303 U.S. at 288–89). "In assessing whether a complaint satisfies that standard, a court may look either to the value of the right that [the] plaintiff seeks to seeks to enforce or to protect or to the cost to the defendants to remedy the alleged denial." *Smith v. Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978) (quotation marks and footnote omitted).

The district court held that, using either measuring stick, the Professors failed to satisfy the amount-in-controversy requirement. *Bronner IV*, 364 F. Supp. 3d at 22. There was "no indication" that "requir[ing] ASA to comply with its governing documents and halt improper payments . . . would cost ASA any money to implement." *Id.* Moreover, the Professors "failed to explain how the right they seek to enforce—the right to be voluntary members of an apolitical, academic organization—is

worth \$75,000." *Id.* The Professors contend that the district court erred in valuing the requested relief.

On appeal, their primary argument is that the amount in controversy includes "withdrawals from the ASA Trust Fund by the individual defendants and payments for improper purposes," purportedly "exceeding \$100,000 per year." Professors' Br. 31. They maintain, therefore, that "the value of the object of the litigation," *Hunt*, 432 U.S. at 347, easily satisfies the jurisdictional minimum. But the Professors provide no record citation supporting this valuation, nor do they respond to the defendants' assertion that this argument was not made in district court. The Professors needed to "anchor[] th[eir] claim in the record," *Angelex, Ltd. v. United States*, 907 F.3d 612, 620 (D.C. Cir. 2018) (citing FED. R. APP. P. 28(a)(8)(A)), since we are neither "expected to be mindreaders," *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005), nor required to "scour the . . . record ourselves," *Sierra Club v. EPA*, 925 F.3d 490, 496 (D.C. Cir. 2019). They did not and have thus forfeited their insufficiently developed argument. *See, e.g.*, *Schneider*, 412 F.3d at 200 n.1 ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."). Because the Professors otherwise fail to explain how the equitable relief they seek exceeds the \$75,000 threshold, we find no error in the district court's assessment.

### 3. Punitive Damages

Although "[i]t is clear that punitive damages should be considered in determining the jurisdictional amount in controversy," *Hartigh v. Latin*, 485 F.2d 1068, 1071–72 (D.C. Cir. 1973) (per curiam), the Professors did not ask the district court to consider such damages, in the second amended

complaint or otherwise. Despite this inconvenient fact, they assert that the district court erred by failing to do so.

Considering the Professors' limited entitlement to compensatory damages, *see supra* at 22–24, they would have to rely almost entirely on punitive damages to satisfy the amount in controversy. "Liberal pleading rules are not a license for plaintiffs to shoehorn essentially local actions into federal court through extravagant . . . punitive damage claims." [10] *Kahal v. J.W. Wilson & Assocs., Inc.*, 673 F.2d 547, 549 (D.C. Cir. 1982) (per curiam). Thus, "[c]lose scrutiny" is necessary "where the availability of punitive damages is the sine qua non of federal jurisdiction." *Id.* Additionally, the Professors could have sought such damages at any time during the lengthy litigation below and their attempt to do so for the first time on appeal is too little, too late. "The burden of establishing the amount in controversy is on the person claiming jurisdiction," *King*, 520 F.2d at 1145, and "arguments in favor of subject matter jurisdiction can be waived by inattention or deliberate choice," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008). Faced with the Professors' silence, the district court did not err in failing to assess *sua sponte* their potential to recover punitive damages.

### III. Ultra Vires Claim

The Professors also contend that the district court erred when it dismissed the *ultra vires* claim in the first amended complaint. But, even if the dismissed claim had survived, it would not alter the valuation of the amount in controversy. The

---

[10] We express no opinion on the merits of the Professors' suit. As the district court recognized, they very well "may have meritorious claims arising from their individual injuries as ASA members." *Bronner IV*, 364 F. Supp. 3d at 12. But that acknowledgment does not open the door to federal court.

Professors did not plead any damages unique to the first *ultra vires* claim. Indeed, the *ultra vires* claims in the second amended complaint alleged substantially the same injuries, including the ASA's loss of revenue, its improper expenditure of funds and its reputational harm. Thus, we do not reach this argument because there is absolutely no indication that consideration of the dismissed *ultra vires* claim could cure the jurisdictional deficiencies that plagued the second amended complaint.[11]

## IV. Conclusion

The Professors cannot seek relief on the ASA's behalf other than through a derivative suit. And although District of Columbia law permits them to seek damages directly for individualized injuries, the Professors have not demonstrated that those damages come close to exceeding the amount in controversy required for federal diversity jurisdiction. They also failed to seek punitive damages and forfeited their argument regarding the value of the requested injunctive and declaratory relief. Thus, because it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional

---

[11] "[W]hen a district court grants a Rule 12(b)(6) motion to dismiss for failure to state a claim, that dismissal 'operates as an adjudication on the merits' under Rule 41(b) '[u]nless the dismissal order states otherwise.'" *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 132 (D.C. Cir. 2012) (Kavanaugh, J., concurring) (alteration in original). And it is "not proper for federal courts to proceed . . . to a merits question despite jurisdictional objections." *In re Madison Guar. Sav. & Loan Ass'n*, 173 F.3d 866, 870 (D.C. Cir. 1999) (per curiam) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).

amount," *St. Paul Mercury*, 303 U.S. at 289, we affirm the district court's dismissal for lack of subject-matter jurisdiction.

*So ordered.*